***Exhibit 3***

# THE
# Parliamentary History
## OF
# ENGLAND,

FROM

THE EARLIEST PERIOD

TO

THE YEAR

1803.

FROM WHICH LAST-MENTIONED EPOCH IT IS CONTINUED
DOWNWARDS IN THE WORK ENTITLED,
" THE PARLIAMENTARY DEBATES."

---

VOL. XVII.

A. D. 1771—1774.

---

LONDON:

PRINTED BY T. C. HANSARD, PETERBOROUGH-COURT, FLEET-STREET:
FOR LONGMAN, HURST, REES, ORME, & BROWN; J. RICHARDSON; BLACK, PARRY, & CO.; J. HATCHARD; J. RIDGWAY; E. JEFFERY; J. BOOKER; J. RODWELL; CRADOCK & JOY; R. H. EVANS; E. BUDD; J. BOOTH; AND T. C. HANSARD.

1813.

Generated on 2025-05-04 15:07 GMT / https://hdl.handle.net/2027/msu.31293000894224
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
MICHIGAN STATE UNIVERSITY

clined it. Mr. Roberts, being himself unacquainted with the city laws, demanded counsel, that justice might be done him in the course of the scrutiny. This reasonable demand, contrary to the usage of the city of London, and unprecedented in the general conduct of elections, was denied him; and therefore he chose rather to have recourse to the impartiality of a parliamentary scrutiny, than to trust himself in the hands of such partial scrutinizers. And no man, surely, can have a juster claim to prefer a petition, and to have it fairly heard.

Sir *Joseph Mawbey*. The hon. gentleman who has now told the House that Mr. Roberts was refused counsel, appears to have been misinformed. Mr. Roberts began his scrutiny without counsel, and did not give notice to the lord mayor of his intention until a day or two before the sheriffs were obliged to make their return of a member. By this artful method of demanding counsel at such a time, it was thought, when no other hope was left, to have prolonged the time, and to have defeated the election by protracting the return. He can therefore have no right to petition on this ground.

The motion was then agreed to.

Feb. 28. The Speaker informed the House, that he had received a letter from Mr. Roberts, acquainting him that he desired to withdraw his petition.

Mr. Alderman *Hopkins* then made an apology for the trouble he had given the House on Mr. Roberts's account; he said, he was averse, from the first, to any petition being presented, as he was confident the present sitting member was a gentleman of such honour, that he would not make use of any unfair means to gain a seat; that he could wish the lord mayor was present, as he was sure he would entirely acquit him of any partiality in the business; and he wished to acquaint the House, that he only presented the petition as a member, by the desire of Mr. Roberts, who, he said, had not acquainted him with any intention of withdrawing it. He concluded, wishing the lord mayor health and prosperity to enjoy his seat for life.

The Petition was then withdrawn.

*Proceedings in the Lords on the Question of Literary Property.**] February 4. The order of the day being read, for hearing counsel in the cause wherein Alexander Donaldson and John Donaldson are appellants, and Thomas Beckett and others are respondents; and for the judges to attend; counsel were accordingly called in;

Mr. Attorney General *Thurlow* opened as counsel for the appellants. He first entered into a minute investigation of the idea inculcated by what is called a publication; he then dwelt much upon the sense of the word 'property,' defining it philosophically, and in the separate lights of being corporeal and spiritual; the term Literary Property, he in a manner laughed at, as signifying nothing but what was of too abstruse and chimerical a nature to be defined. The booksellers, he observed, (exemplifying his observations by several cases) had not, till lately, ever concerned themselves about authors, but had generally confined the substance of their prayers to the legislature, to the security of their own property; nor would they probably have, of late years, introduced the authors as parties in their claims to the common law right of exclusively multiplying copies, had not they found it necessary to give a colourable face to their monopoly. He was very diffusive upon grants, charters, licences, and patents from the crown, both to corporate bodies and individuals, tracing them far back, and asserting, that they all specifically proved, that, if there had been any inherent right of exclusively multiplying copies, such instances of exerting the royal prerogative would have been unnecessary. He particularly adverted to the statute of the 8th of queen Anne, maintaining that it was not merely an accumulative act declaratory of the common law, and giving additional penalties, but that it was a new law to give learned men a property which they had not before, and that it was an incontrovertible proof that there previously existed no common law right, as contended for by the respondents. He cited many cases to prove his arguments; some before the 8th of queen Anne, and others immediately upon that statute, generally inferring that the grand question touching the common law right had never been decisively determined by any chancellor.

He concluded his speech with a compliment to his learned coadjutor, and a hope, that as the lords of session in Scotland had freed that country from a mono-

* "The House of Lords this session, in its judicial capacity, determined the great question of literary property, which was brought before them by an appeal from a decree in

mined upon the prerogative right of the crown. The executive power of the crown drew after it this prerogative right, which extended to all acts of parliament, matters of religion, and acts of state. The case of Basket and the University of Cambridge, which was a late one of the same kind, appeared, upon the pleadings, to be a question arising between two parties, who claimed under concurrent and inconsistent grants of the crown. My late hon. and learned friend, Mr. Yorke, who argued that case, endeavoured to shew, that his client's right might arise from the power of the crown; and, to illustrate his argument, said, it might perhaps be "property founded on prerogative,"—a language, however allowable for counsel, not very admissible by, or intelligible to, a judge: but the certificate in the above case does not say a word of property; and, indeed, if such a claim as that had been founded on property, every one would have as good right to publish abridgments of the statutes, as of any other book.

Lord Northington granted injunctions on behalf of publications which he considered as matters of state, but left such works as The Whole Duty of Man to their common remedy at law. When works of literature, encouraged by the facility of printing, began to spread, we find the cases multiply. Of these, however, I lay entirely out of the question, all those which appear to be cases between rival patentees of the crown, all those relating to the Stationers Company, all those concerning religion, law, or the state, and all unpublished manuscripts.

I shall premise, too, before I examine the cases which happened after the statute, that I am of opinion, that the statute gives authors and their assigns a general right not connected with the penalty, and that statutable right falls under the protection of a court of equity, and may claim the benefit of an injunction. To obtain such an injunction, it is by no means necessary that the plaintiff should make out a clear indisputable title. It may be granted on a reasonable pretence, and a doubtful right, before the hearing of the cause; nor is it objection that the party applying for it has a remedy at law. No bill for an injunction is to be found before the statute.

The causes which have come before the court of Chancery since the statute, I find to be 17 in number. Of these eight were founded on the statute right: in two or three, the question was, whether the book was a fair abridgment: and all the rest were injunctions granted *ex parte*, upon filing the bill, with an affidavit annexed. In these cases the defendant is not so much as heard; and can I imagine, that so many illustrious men, who presided in the court of Chancery, would, without a single argument, have determined so great and copious a question, and which has taken up so much of your lordships' time? In fact, none of them wished to have it said he had formed any opinion on the subject.

From my own experience at the bar, I know that the successive chancellors and masters of the Rolls, lord Northington, lord Camden, sir Thomas Clark, &c. have all looked upon the case as undetermined; it may now, therefore, be fairly treated as a new question; and indeed, it has been argued as such upon general principles. Let us consider what principles have been laid down as the foundation of this new species of property. I have heard but of one, namely, that such a claim is inconsistent with the moral fitness of things. This idea of moral fitness is indeed an amiable principle, and one cannot help wishing all claims derived from so pure a source might receive all possible encouragement; but this principle is no universal rule of law, nor can it be made to apply in all cases. Beautiful as it may be in theory, to reduce it into the practice and execution of common law would create intolerable confusion; it would make laws vain, and judges arbitrary.

Nor is it possible to support the Respondents' claim upon this principle, and not allow its operation in a variety of other cases, where, it is confessed on all hands, it cannot be allowed. Abridgments of books, translations, notes, as effectually deprive the original author of the fruit of his labours, as direct particular copies, yet they are allowable. The composers of music, the engravers of copper-plates, the inventors of machines, are all excluded from the privilege now contended for; but why, if an equitable and moral right is to be the sole foundation of it? Their genius, their study, their labour, their originality, is as great as an author's, their inventions are as much prejudiced by copyists, and their claim, in my opinion, stands exactly on the same footing; a nice and subtle investigation may, perhaps, find out some little logical or mechanical diffe-

Generated on 2025-05-04 15:09 GMT / https://hdl.handle.net/2027/msu.31293000894224
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from MICHIGAN STATE UNIVERSITY

that time there was no idea of a common law claim. So little did they then dream of establishing a perpetuity in their copies, that the holders of them finding no prerogative security, no privilege, no licensing act, no Star Chamber decree to protect their claim, in the year 1708 came up to parliament in the form of petitioners, with tears in their eyes, hopeless and forlorn; they brought with them their wives and children to excite compassion, and induce parliament to grant them a statutory security. They obtained the Act. And again and again sought for a further legislative security.

Thus, my lords, stands the pretence on the score of usage, of which your lordships have heard so much on one side the question. I come now to consider upon what foundation stand the prerogative copies; and these were in fact cases between co-patentees (for I must consider the Stationers' Company itself as a patentee of the crown) and no authorship right occurs here. The right in the crown is supposed to come either from purchase or contract; and our law argues from principles, cases, and analogy; but not a word of this in the judgment of the court; but the arguments of counsel are adduced to prove the point. The argument of counsel is a sorry kind of evidence indeed; in most cases it would be very dangerous to rely on it, but here it is such stuff as I am ashamed to mention. You have them at length in Carter: First, it is put on the topic of prerogative, next of ownership. 1. Henry the 6th brought over the printers and their presses, *ergo*, says the counsel, he has an absolute right to the whole art, and all that it can produce. 2. Printing belongs to nobody, and what is nobody's is of course the king's. 3. The king pays his judges, *ergo*, he purchases this right for a valuable consideration. 4. He paid for the translation of the Bible, therefore, forsooth, he bought a right to sell bibles. Away with such trifling! Mr. Yorke put it on its true footing. Ought not the promulgation of your venerable codes of religion and of law to be entrusted to the executive power, that they may bear the highest mark of authenticity, and neither be impaired, or altered, or mutilated? These printed acts are records themselves, are evidence in a court of law, without recurring to the original parliamentary roll. Will you, then, give this honourable right to your sovereign as such? or will you degrade him into a bookseller? Indeed, had he no other title to this distinction, that could hardly be maintained.

But if this will not serve the purpose, recourse is next had to injunctions; they, it is said, have put the right out of doubt; nay, lord Hardwicke's name is triumphantly brought on the stage, and he is declared to have absolutely decided the point: no man, I am sure, can venerate his name (which will be dear to posterity as long as law or equity remain) more than I do. But this boasted case, like all the rest that have been produced, entirely fails in the proof; and when my lord chief justice reads his own note of what lord Hardwicke said upon the occasion, it appeared that lord Hardwicke's words had been twisted to an opposite meaning to what he intended. All the injunction cases have been ably gone through. I shall only add, in general terms, that they can prove nothing: they are commonly obtained for the purpose of staying waste, and the prevention of irreparable damage. They must, therefore, in their nature be sudden and summary, or the benefit of them would be lost before they are obtained, and they are granted though the right is not clear, but doubtful. The question, whether I am tenant for life or in tail, whether I can maintain my right against the devisee or the heir at law, may be discussed afterwards at leisure; but unless upon shewing a reasonable pretence of title you in the mean time tie up the spoiler's hands who is selling my timber, or ploughing my pasture, my remedy is gone, or comes too late to prevent the mischief. What, then, if a thousand injunctions had been granted, unless the Chancellor at the time he granted them had pronounced a solemn opinion, that they were grounded upon the common law? It would only come to this at last, that the right in question was claimed on one side and denied on the other; therefore till the matter was tried and determined, let the injunction go. Lord Hardwicke, after 20 years experience, in the last case of the kind that came before him, declared that the point had never yet been determined. Lord Northington granted them on the idea of a doubtful title; I continued the practice upon the same foundation; and so did the present Chancellor. Where, then, is the Chancellor who has declared *ex cathedra* that he had decided upon the common law right? Let the decision be produced in direct terms. It is amazing that we should have been

Generated on 2025-05-04 15:09 GMT / https://hdl.handle.net/2027/msu.31293000894224
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google
Digitized by Google
Original from MICHIGAN STATE UNIVERSITY