# ***Exhibit 6***

properly in Chancery upon many accounts, not only as it was a *scire facias* to repeal letters patent, but as it was a cause of state; and likewise as it was a marine cause, and did concern depredations on the sea, in which cases the Chancery as well as the Admiralty hath a clear jurisdiction, and this appears by what was said in *Peter Blad's* case (3 *Swans*. 603, 604), and by many records and precedents cited in my Parliament MSS., tit. *Admiralty*, and tit. *Chancery*; and is most expressly so settled and enacted in a statute not printed; viz. 31 *H*. 6, *Rot. Pl*. No. 68. (5 *Rot. Parl*. 268.)

Secondly, it is a considerable question whether these letters of marque were ever good, because they were granted *flagrante bello*, at which time the previous conditions, of letters of request, &c., could not be observed.

Thirdly, if they were never so well granted at first, yet they are now very clearly determined. Wherein, first, it is to be considered, that all letters of marque and reprisal are in their own nature determinable at the pleasure of the prince or state which granted them, and that, without any wrong or injustice at all to the person to whom they are granted; for they are and must always be subject to that supreme law of *salus populi*; and if [671] it were otherwise, it would be quite out of the power of any government to preserve their subjects in peace, but all treaties of accommodation must be forborne until he who had letters of marque would consent, which were most absurd; and *ergo*, the clause in these letters that no future peace should derogate from them, as it is new and of a strange nature, so it is utterly void in itself; for the king's prerogative in matters of peace and war is absolute and unlimited, nor can the king put it out of his power to make a peace, or enable any subject to dispute his sovereignty in this point.

Secondly, this point is most clear by the constant practice of all ages and all nations. And, first, it is plain that a truce, which is less than a peace, doth supersede all letters of marque for that time. This appears by 10 *H*. 6, *Rot. Pl*. No. 34 (4 *Rot. Parl*. 402), where the Commons, in their petition for reprisals against *Denmark*, say there was a statute made in 4 *H*. 6, that if the subject be spoiled contrary to the tenor of any truce, for want of mentioning therein that letters of marque should cease, the persons grieved should have reprisals. In the next place a safe conduct, which is less than a truce, doth likewise supersede all letters of marque; and so it was ruled in the parliament of *Paris* against the merchants of *Montpellier*, who would have executed their letters of marque against the subjects of *Genoa*, upon such as came thither by safe conduct, as appears, *Papon's arrets*, 284; and the like appears by the judgment of the parliament 2 *H*. 5, *pl*. 1, *Rot. Par*. No. 34 (4 *Rot. Parl*. 50), where some citizens of *London* who had letters of marque against the *Genoese*, petitioned the king, that he would be graciously pleased hereafter to grant them no safe conduct in prejudice of those letters of marque. And be-[672]-fore that, viz. 11 *H*. 4, *Rot. Pl*. No. 66 (3 *Rot. Parl*. 643), *John Kedwelly de Bridgewater* complained in parliament of divers injuries done him by the *French*, and prayed letters of marque and reprisal, as well by sea as by land, against all those who have no safe conduct; the answer was, that letters of request ought first to precede; but admitted on all hands that a safe conduct would prevail.

Wherefore upon the whole matter, I gave judgment, that the letters patent of marque and reprisal should be vacated and cancelled.—Lord *Nottingham's* MSS.

## TONSON *v*. WALKER.(1) 25*th April* 1752.

Injunction till hearing [to restrain the publication of *Milton's* poems with Dr. *Newton's* notes, notwithstanding a small addition of original commentary.

The Solicitor-General moved for an injunction to stay the Defendant's printing an edition of *Milton*, with Dr. *Newton's* notes, and made three points.

1. That at the common law, authors have a right to their productions, exclusive and independent of the statute 8 *Anne*, *c*. 19, upon principles of property, upon the constant opinion of all men. In 1662, statute 13 & 14 *Car*. 2, *c*. 33, *s*. 3, gives power to the Universities to licence books, except such as belong to particular persons, and those not without their consent, supposing there were such books. Another clause prohibits sell-[673]-ing books without the consent of the proprietor; not giving any right, but supposing that it already existed. That law expired in

1692; it dropped in respect of the licensing clauses, and not from the acknowledgment of property in authors. In this time several bye-laws were made by the Stationers' Company, and confirmed by the Chancellor, settling penalties on those violating the right of the owners. In 1694 bye-laws were made to remedy what was lost by the expiration of the act, but they were ineffectual. The principle of ownership is received as a ground of property, 18 *Car.* 2. The Stationers against the patentees, about the printing of *Roll's Abridgment* (*Carter*, 89), 29 *Car.* 2 *The Company of Stationers* v. *Seymour* (1 *Mod.* 256). There *Pemberton* argued from the principle of property in the author, and it was admitted on the other side; and the Court said that almanacks might belong to the crown, because there was no particular author. The world has entertained the same notion; they buy and sell, settle, pay debts, and make provisions. The Defendants admit it, and, therefore, cannot contradict the right of authors antecedent to the statute of *Anne*. If any other proof were wanted, the preamble to that statute supplies it.

2. Whether the act has accumulated remedies to secure a prior right violated, or to take it away? The act took its rise from a private petition of booksellers, asserting, as a thing uncontroverted, that they had the right in the copies, and prayed a confiscation of what had been printed, the provision by action on the case not being effectual. The preamble is to encourage authors; taking away copyright would not do it; it is not done; but they give, during a certain time, pe-[674]-nalties of confiscation, and other penalties and privileges; and these to begin from the entry in the Stationers' Hall. The Universities have a right to particular books; *Oxford*, in 1703, to Lord *Clarendon's History*: the act neither benefits nor prejudices any right under letters patent.

3. Subsequent determinations and expositions show that it has been so understood. The act does not meddle with law books, because it did not mean to take away the right of the crown or patentee; that was not a mischief to be remedied: yet in cases of law books, the Court has interposed on the original right.

1. *Webb* v. *Rose*, *Easter* term 1729. Decree, 1732 (cit. 4 *Burr.* 2330; 2 *Bro. P. C.* ed. *Toml.* 138). The bill was by *Webb's* executors, to prevent the Defendant printing his Precedent's of Conveyancing, and decreed; not from the force of the statute of *Anne*; 1, the work was not within it; 2, it was not then printed, and the act extends only to books after publication, and no action would lie, because they were not entered. It turned, therefore, on the original right.

2. *Forester* v. *Walker*, 13th *June* 1742 (cit. 4 *Burr.* 2331; 2 *Bro. P. C.* ed. *Toml.* 138). A bill was brought by the author of Notes of Cases, in Lord *Talbot's* time, to enjoin the printing; this being a law report, was not within the act, and could not be published without the licence of the patentee, yet an injunction was granted and acquiesced under.

3. *Pope* v. *Curl*, 5th *June* 1741 (2 *Atk.* 342). Bill to prevent the publication of his letters with Dr. *Swift*; upon [675] argument, the injunction was granted and acquiesed under.

4. *Austin* v. *Cay*, 17th *May* 1739. A demurrer, because the discovery would expose the party to penalties, was over-ruled, the remedy in equity being upon the original right; beside, there is no proceeding for the penalties until entry in the books of the Company; but the want of entry is no impediment here, the Court proceeding on the property; and the objection has been repeatedly over-ruled. If the term is expired, the Court does not refuse to interpose. Sir *Joseph Jekyl*, who sat in parliament when the act passed, made a precedent, 9th *June* 1735.

5. *Anon.* (probably *Eyre* v. *Walker*, 9th *June* 1735, cit. 4 *Burr.* 2325; 2 *Bro. P. C.* ed. *Toml.* 138). A bill for an injunction against the Defendant, for printing the Whole Duty of Man, upon an assignment of property by the author of it; the work having been printed in 1657, was not within the statute of *Anne*; an injunction was granted and acquiesced under. The author was only guessed at, but it was presumed that the person who first brought it to the press, had the property of it assigned to him.

6. ——— v. *Falkner*, 28th *November* 1735 (*Motte* v. *Falkner*, cit. 4 *Burr.* 2325; 2 *Bro. P. C.* ed. *Toml.* 138), by Lord *Talbot*. The bill was filed by the assignee of *Pope's* Letters for an injunction, and to restrain their being printed in *Ireland*. Several of the pieces were printed in 1701 and 1702, and 1708, so that the term

of twenty-eight years was expired. Lord *Talbot* granted an injunction to restrain the printing of the whole; and that was acquiesced under.

**[676]** 7. *Walker* v. *Walker*, 27th *June* 1736 (*Walthoe* v. *Walker*, cit. 4 *Burr.* 2325; 2 *Bro. P. C.* ed. *Toml.* 138). The bill was to restrain the printing of *Nelson's Festivals*, a book first printed in 1703. Sir *Joseph Jekyl* granted the injunction, which could not have been unless the property had continuance beyond the term limited by the act, and it was acquiesced under.

8. *Tonson* v. *Walker*, 5th *May* 1739 (cit. 4 *Burr.* 2325). The bill claimed property in *Milton's* Poems, and the notes of the commentators; on certificate of bill, and reading affidavit and assignment, an injunction was granted *ex parte*, and acquiesced under.

No one application was refused. This is, at least, sufficient for granting an injunction till hearing; especially where the Defendant has acquiesced in former instances, and has added what he has clearly no right to, as *Newton's* notes. Public utility makes one wish the law could be thus; and that consideration weighs in cases doubtful.

The objections are not true in fact, or grounded on narrow principles. That it will make books dearer; manifestly it will not. The public is interested to have good editions, and cheap. If the property is not secured, there can be no fine editions of new books, while they may be printed worse, on a worse paper; if they have property it may be done, because they may wait for time to supply the charge by a number. As to cheap editions, less than 500 copies will not reimburse them; it is their interest then to make such an edition as will be sold universally. This is a scandalous edition; the **[677]** paper and the printing bad. The principle is narrow; books are the production and property of man's ingenuity; the property in them, is the only encouragement of letters.

The *Lord Chancellor.* If this case comes to be heard, I shall be inclined to send a case to the judges, that the point of law may be finally settled, for I do not know that it has been judicially determined; but Dr. *Newton's* notes come within the statute of *Anne*; and this edition mixing his notes with the rest, cannot go on unless they can answer that. I should therefore be glad to hear the Defendant's counsel on that point.

Mr. *Clark* for the Defendant. There are two questions: 1, the nature of the work, and the ingredients of it; 2, the Plaintiff's right to the ingredients, and whether what the Defendants have done is an infringement of his right?

The ingredients are said to be the text, and the notes of various editions by *Fenton*, *Bentley*, and *Newton*; there are other ingredients to which the Plaintiff has no right, from the comment of *Hume*, *Addison*, *Pearse*, *Richardson*, *Warburton*, *Benson*, *Upton*, and the essay on *Milton's* Imitation. The Defendant, *Merchant*, is a man of learning, and an admirer of *Milton*. Dissatisfied with the text and notes, he planned a new edition from various sources.

The *Lord Chancellor.* I shall not determine the general question, either at law or on the effect of the statute; but I desire to know **[678]** how you show that Dr. *Newton's* notes are not within the statute.

Mr. *Clark.* There are several works not within the statute; as a dictionary, like *Stephens's* Thesaurus. If another writer were to compile another dictionary, and take considerable portions of the former, if not done evasively, there would be no violation of the act. No more is a fair abridgement. As in *Gyles* v. *Davis*, 1741, the bill was filed to restrain the publication of an abridgment of *Hale's* Pleas of the Crown. (*Eyles* v. *Wilcox*, 2 *Atk.* 241; 3 *Atk.* 269; *Barnard.* 386, cit. 2 *Bro. P. C.* ed. *Toml.* 138.) The objection was the sameness of the work, and a reference was directed on that point; but your Lordship declared that a fair abridgment is not within the act. In *Cogan* v. *Cave*, 26th *July* 1743, the bill prayed an injunction to stay the editor of a magazine publishing the parts of the Unfortunate Young Nobleman; the injunction was dissolved on the merits.

The *Lord Chancellor.* Before I give an opinion, I will have ascertained the number of the original notes of *Merchant.* If a critic publishes an edition *cum notis variorum*, I think that a republication is within the act. It is a work of which the property is in the author, and protected by the act. So is a dictionary. That brings it to the question, whether the alterations make it a new work, or are intended evasively to colour a new edition. In the case about *Partridge's* Almanack

(10 *Mod.* 105; 4 *Burr.* 2402), originally before Lord *Cowper*, a case was directed for the Court of King's Bench, and I believe it was never determined.

[679] The *Attorney-General* cited *Read* v. *Hodges*, 19th *May* 1740 (cit. 2 *Bro. P. C.* ed. *Toml.* 137; 2 *Atk.* 142), to stay the republication of a history of the Czar of *Muscovy*.

The *Lord Chancellor*. I thought it an evasive abridgment, and therefore allowed the injunction. In *Gyles* v. *Wilcox*, the abridgment contained 35 sheets, the original 275; it was referred to award, and held a fair abridgment, and not within the statute.

30th *April* 1752. It appeared that there were 28 notes by *Merchant*, and that the rest were 1500.

The *Lord Chancellor* [Hardwicke]. I entertained no doubt from the first whether I should grant an injunction, but how far, and to what extent; 1. In regard to this book, whether the property was sufficient to maintain it? 2. To what extent it should go, as to vending this edition?

It is not necessary or proper to determine the first question; but if the case is doubtful, that may be a ground to grant an injunction until the matter can be considered at the hearing; thus in waste, not a clear right, but probability of right, may be, and is, a ground for an injunction. (*Note*: Of the cases on this point, some, at the first view, appear inconsistent with the doctrine of the text.) In *Partridge's* case, Lord *Cowper* and Lord *Harcourt* both thought the right doubtful; but the first granted an injunction till the hearing; the latter [680] directed a case, not saying that the injunction should be continued; but I take it that is done of course; because making a case is a kind of continuation of the hearing, by taking in the assistance of the court of law.

It is immaterial whether the question arises on letters patent or general property: both are to convey a right or claim. I will only say that there is no determination of the general point. Cases of pirating copies from unpublished books do not come up to the present case; they were never made *publici juris*, but are as much the author's as any thing else in his closet. Such are the cases of Mr. *Webb*, Mr. *Forester*, and Dr. *Burnett's* treatise *de Statu mortuorum* in Lord *Macclesfield's* time. (*Burnett* v. *Chetwood*, 2 *Mer.* 441, 442. n.) The strongest thing is, what is said by the judges in *Seymour's* case (1 *Mod.* 256), arguing on the general right.

In cases on grants by the Crown of exclusive publication of particular books, as Bibles, Prayer-books, acts of parliament, and year-books, the general argument in favour of the patentee has been, that the books were made at the expense of the Crown, and, therefore, the property is in the Crown. And these cases are used as tending to prove a general right in the author.

Arguments from public utility may be urged on both sides; but if this were more doubtful, still it is clear that the injunction ought to be granted, because the notes are colourably abridged or taken from *Newton*, and only twenty-eight added by Mr. *Merchant*. What right could he give to *Walker* to print Dr. *Newton's* notes? To say that he had the same right to publish *Newton's* notes, as *Newton* had to publish those of others, is not defence, but recrimination.

[681] A fair abridgment would be entitled to protection; but this is a mere evasion.

Therefore let an injunction be issued till the hearing, and let the Plaintiff speed his cause.

"His Lordship doth order that an injunction be awarded to restrain the Defendants, their servants, agents, and workmen, from printing, reprinting, publishing, or exposing to sale any copy or edition of a certain book or poem, entitled *Paradise Lost*, composed by *John Milton*, or of the life of the said *John Milton*, or of the notes of various authors upon the said poem, compiled by Dr. *Thomas Newton*, until the hearing of this cause; and it is further ordered, that the Plaintiffs do speed their cause." Reg. Lib. B. 1751, fol. 322.

(1) 4 *Burr.* 2325, 2327, 2379, 2380; 1 *Black.* 345; 2 *Eden* 328; 1 *Cox*, 285. The present report confirms Lord *Mansfield's* representation of this case in the passage first cited.