**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| RADIAN MEMORY SYSTEMS LLC,<br>*Plaintiff*,<br>v.<br>SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS AMERICA, INC.,<br>*Defendants*. | Civil Action No. 2:24-cv-1073<br><br>**JURY TRIAL DEMANDED** |

**STATEMENT OF INTEREST OF**
**THE UNITED STATES OF AMERICA**


NICHOLAS T. MATICH
*Acting General Counsel*

AMY J. NELSON
*Acting Solicitor*

ROBERT J. MCMANUS
*Acting Deputy Solicitor*

SARAH E. CRAVEN
MICHAEL TYLER
*Associate Solicitors*

Office of the Solicitor
U.S. Patent & Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313
Telephone: 571-272-9035
*Attorneys for the Acting Director of the U.S. Patent & Trademark Office*

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
DINA KALLAY
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

YIXI (CECILIA) CHENG)
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
ANDREW N. DELANEY
*Attorneys*

U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 914-256-0514
E-mail: andrew.delaney@usdoj.gov

*Attorneys for the United States of America*

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES .......... 1

BACKGROUND .......... 3

ARGUMENT .......... 4

I. Infringement of a Non-Practitioner's Patent Can Cause Irreparable Harm .......... 5

A. Like Other Types of Property, Patents Can Be Difficult to Value .......... 8

B. The Difficulty of Calculating Damages from Patent Infringement Can Cause Irreparable Harm .......... 9

II. Recognizing a Likelihood of Irreparable Harm Would Not Resolve the Dispute .......... 15

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 13

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) .......... 1, 2

*American Society of Mechanical Engineers v. Hydrolevel Corp.*,
456 U.S. 556 (1982) .......... 2

*Apple Inc. v. Samsung Electronics Co.*,
809 F.3d 633 (Fed. Cir. 2015) .......... 3, 11, 12

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) .......... 10

*Bianco v. Globus Medical, Inc.*,
2014 WL 1049067 (E.D. Tex. Mar. 17, 2014) .......... 12

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) .......... 7, 12, 16

*California Institute of Technology v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) .......... 10

*Core Progression Franchise LLC v. O'Hare*,
No. 21-1151, 2022 WL 1741836 (10th Cir. May 31, 2022) .......... 8

*Dawson Chemical Co. v. Rohm & Haas Co.*,
448 U.S. 176 (1980) .......... 2, 13

*Direct Biologics, L.L.C. v. McQueen*,
63 F.4th 1015 (5th Cir. 2023) .......... 9

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) .......... 8

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .......... *passim*

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) .......... 10

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) .......... 2

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .......... 10

*Fromson v. Western Litho Plate & Supply Co.*,
853 F.2d 1568 (Fed. Cir. 1988) .......... 10

*Garth v. Staktek Corp.*,
876 S.W.2d 545 (Tex. App. 1994) .......... 9

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988) .......... 14

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation*,
831 F. Supp. 1354 (N.D. Ill. 1993) .......... 13, 14

*i4i Ltd. Partnership v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) .......... 7, 11

*Joy Technologies, Inc. v. Flakt, Inc.*,
6 F.3d 770 (Fed. Cir. 1993) .......... 16

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) .......... 7, 11

*National Society of Professional Engineers v. United States*,
435 U.S. 679 (1978) .......... 2, 3

*Nichia Corp. v. Everlight Americas, Inc.*,
855 F.3d 1328 (Fed. Cir. 2017) .......... 7

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC*,
584 U.S. 325 (2018) .......... 8

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) .......... 10

*Presidio Components, Inc. v. American Technical Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) .......... 7, 12

*Robert Bosch LLC v. Pylon Manufacturing Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) .......... 3, 8

*RoDa Drilling Co. v. Siegal*,
552 F.3d 1203 (10th Cir. 2009) .......... 9

*Smith International, Inc. v. Hughes Tool Co.*,
718 F.2d 1573 (Fed. Cir. 1983) ........ 3

*TEK Global, S.R.L. v. Sealant Systems International, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) ........ 11

*Ticor Title Insurance Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999) ........ 8

*Triple-A Baseball Club Associates v. Northeastern Baseball, Inc.*,
832 F.2d 214 (1st Cir. 1987) ........ 8

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........ 2

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
809 Fed. App'x 965 (Fed. Cir. 2020) ........ 12

*Walgreen Co. v. Sara Creek Property Co., B.V.*,
966 F.2d 273 (7th Cir. 1992) ........ 13

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
549 U.S. 312 (2007) ........ 2

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ........ 6, 15

**Statutes**

15 U.S.C. § 4301 ........ 1

28 U.S.C. § 283 ........ 3

28 U.S.C. § 517 ........ 1

35 U.S.C. § 1 ........ 4

35 U.S.C. §§ 101-103 ........ 8

35 U.S.C. § 154(a)(1) ........ 5

35 U.S.C. § 261 ........ 5, 8

35 U.S.C. § 282(a) ........ 5

35 U.S.C. § 283 ........ 5, 16

**Other Authorities**

Adam Mossoff, *The Injunction Function: How and Why Courts Secure Property Rights in Patents*, 96 NOTRE DAME L. REV. 1581 (2021) .......... 14

Office of Management and Budget, Circular No. A-119, *Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities*, 81 FR 4673 (Jan. 27, 2016) .......... 1

Kristen Jakobsen Osenga, *"Efficient" Infringement and Other Lies*, 52 SETON Hall L. Rev. 1085 (2022) .......... 14, 15

Abigail Slater, Assistant Attorney General, Address at University of Notre Dame Law School (Apr. 28, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-first-antitrust-address-university-notre .......... 2

U.S. Constitution Article I, § 8, Clause 8 .......... 4

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States, through the Department of Justice Antitrust Division and the United States Patent and Trademark Office (USPTO), has a strong interest in protecting and promoting competition in the U.S. economy, including by promoting a strong and effective patent system. The USPTO—the Executive-branch agency charged with examining patent applications, issuing patents, and advising the President on intellectual property policy through the Department of Commerce—furthers these interests by promoting the proper and consistent interpretation of the Patent Act, which protects patent rights and rewards innovation. Broadly, the United States seeks to advance consistent and correct application and enforcement of the intellectual property laws, including the Patent Act, to safeguard patents, fuel economic growth, and spur innovation to advance American freedoms. Patent rights also work with the antitrust laws to spur competition among innovators to create new and useful technologies, products, or services for consumers.

The complaint here involves a product standard developed by a private consortium that includes several large firms who practice the standardized technology (commonly called implementers). While Radian did not bring an antitrust claim, the complaint nevertheless raises competition concerns. There is "serious potential for anticompetitive harm" inherent in these standards-development organizations (SDO),[1] which "often have economic incentives to restrain

[1] This SOI adopts the terminologies of Standards Development Organization Act of 2004, 15 U.S.C. § 4301 et seq. and Office of Management and Budget, Circular No. A-119, *Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities*, 81 FR 4673 (Jan. 27, 2016). While the standard at hand was developed by

competition," as their members collaborate on what products will or will not be "manufacture[d], distribute[d], or purchase[d]." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988); *see also Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp*., 456 U.S. 556, 571 (1982) ("[A] standard-setting organization . . . can be rife with opportunities for anticompetitive activity."). These competition concerns are particularly acute where an SDO is controlled by large implementers with market power. Large purchasers working together can exercise monopsony power—the "mirror image" of monopoly power. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312, 322 (2007). An abuse of market power "to squash nascent, albeit unproven competitors" is "inimical" to the goal of preserving and protecting competition. *See United States v. Microsoft Corp*., 253 F.3d 34, 79 (D.C. Cir. 2001).

A patent gives the "right to exclude others from profiting by the patented invention," *Dawson Chem. Co. v. Rohm & Haas Co*., 448 U.S. 176, 215 (1980), in order "to encourage invention," *Eldred v. Ashcroft*, 537 U.S. 186, 216 (2003). The United States has an interest in encouraging innovation not only from large firms, but also from "Little Tech," which includes "small businesses and innovators." *See* Abigail Slater, Assistant Att'y Gen., U.S. Dep't of Just. Antitrust Div., Address at University of Notre Dame Law School (Apr. 28, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-first-antitrust-address-university-notre. Competition benefits from a multiplicity of innovative solutions, leading to a wide range of products and services that offer different solutions to problems. *See Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (Congress's "assumption that competition is the best method of allocating resources in a free market recognizes that all

---

a private consortium rather than an SDO, given the similar collaborative nature of the private consortia and SDO activities, for purposes of this brief, the two are analyzed under the same framework.

elements of a bargain . . . are favorably affected by the free opportunity to select among alternative offers.").

The incentive to innovate at the heart of the Patent Act is undermined when the availability of preliminary injunctions to block infringement is unduly limited. Congress has authorized injunctions "in accordance with the principles of equity to prevent the violation of any right secured by patent," 28 U.S.C. § 283, and "[i]njunctions are vital to [the patent] system" for "encouraging innovation," *Apple Inc. v. Samsung Elecs. Co*., 809 F.3d 633, 647 (Fed. Cir. 2015). Without the possibility of injunctive relief, "the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined." *Smith Int'l, Inc. v. Hughes Tool Co*., 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) (abrogated on other grounds by *eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 393-94 (2006), as noted in *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1148-49 (Fed. Cir. 2011)).

The United States submits this Statement of Interest to provide the Court with views of the Antitrust Division and USPTO on how to assess whether a plaintiff alleging patent infringement has demonstrated a likelihood of irreparable harm under the four-factor test for a preliminary injunction under Supreme Court and Federal Circuit precedent. We do not take a position on any of the other factors for granting a preliminary injunction or on the ultimate question of whether the court should exercise its discretion to issue a preliminary injunction.

**BACKGROUND**

Radian Memory Systems (Radian) filed a complaint for patent infringement against Samsung Electronics (Samsung). In moving for a preliminary injunction, Radian alleges that it developed and patented an innovative technology to improve management of flash solid-state

drives (SSDs), particularly for use in enterprise and data-center operations. Pl.'s Mot. for Prelim. Inj. (Radian Mot.) at 1, ECF No. 43. According to Radian, despite its best efforts to participate in the market before its patents issued, Samsung and other market participants iced Radian out of the industry using standards-development efforts. *Id*. at 1-3. Specifically, Radian alleges that Samsung—a top-tier member of NVM Express (NVMe), which was developing standards in the SSD space—organized others in the industry to try to pressure Radian to join; however, Radian refused due to NVMe's policies that would have required Radian to grant royalty-free licenses of its patented technology to other members. *Id*. at 2. Following Radian's decision not to join NVMe, Radian alleges that the members (including Samsung) began infringing upon Radian's patented technology. *Id.* at 2-3.

Radian claims that it will continue to suffer irreparable harm in the form of loss of both market opportunities, including potential deals with existing and prospective customers, and market position as a technology pioneer, since it is unable to compete with Samsung in the market by licensing its technology to Samsung and others on Radian's own terms. *Id*. at 17-18, 21-23; Jadon Decl. ¶53-54, ECF No. 43-13. Samsung counters that Radian fails to show irreparable harm because of, *inter alia*, timing and party issues, Samsung's Opp. to Radian's Mot. for Prelim. Inj. (Samsung Opp.) at 9-12, ECF No. 47, and because a non-practicing entity, like Radian, expects a royalty and thus monetary relief will provide full compensation, *id.* at 12.

**ARGUMENT**

The U.S. Constitution gives Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to that power, Congress passed the Patent Act, which makes the USPTO responsible for examining and issuing patents to any new, useful, and nonobvious invention. 35 U.S.C. §§ 1, et seq. Under the Patent

Act, a patent has "the attributes of personal property," *id.* § 261; is presumed valid, *id.* § 282(a); and grants the patentee "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States," *id.* § 154(a)(1). "[T]o prevent the violation of any right secured by [a] patent," courts "may grant injunctions in accordance with the principles of equity." *Id.* § 283.

Under the traditional principles of equity for a preliminary injunction, courts must consider the likelihood of irreparable harm. Consistent with Supreme Court and Federal Circuit precedent, this Court should evaluate the possibility of irreparable harm under traditional equitable principles. Under those principles, an ongoing patent infringement would, in many cases, result in irreparable harm based on the inadequacy of a monetary remedy, which can be difficult to calculate accurately. This position treats patents in this specific context like other unique assets that are difficult to value, making damages hard and costly to calculate. And it permits the same remedy—an injunction—to prevent an ongoing violation of rights in a unique asset regardless of who owns the asset. Radian's claims of injury to its market opportunities and position may support a likelihood of irreparable harm because these claims (to the extent supported by evidence) may support a conclusion that monetary damage—an ongoing reasonable royalty—would be difficult and expensive to calculate.[2]

## I. Infringement of a Non-Practitioner's Patent Can Cause Irreparable Harm

The Supreme Court has held that, under well-established principles of equity, a patentee must satisfy the traditional four-factor test to receive an injunction. *eBay*, 547 U.S. at 392-93. For

[2] Radian argues for injunctive relief in part based on 18th-century principles of equity, asserting that under these traditional principles a finding of ongoing infringement is, as a matter of law, irreparable harm. *See* Radian Mot. at 15-16; Samsung Opp. at 2. Such a categorical rule is inconsistent with *eBay*, and the United States does not argue for such a standard.

a preliminary injunction, the four-factor test requires a showing of (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm (with no adequate remedy at law); (3) the balance of the hardships is in favor of the party seeking injunction; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In *eBay*, the Court specifically rejected wholesale categorical rules as inconsistent with equitable principles. 547 U.S. at 393. It rejected the Federal Circuit's "general rule," unique to patent disputes, that an injunction will issue upon a finding of infringement and validity. *Id.* at 393-94. And, conversely, it rejected the district court's "broad classification" that a patentee who is willing to license could not establish irreparable harm. *Id*. at 393.

Specifically, in considering the situation of patentees who license their patents, the Supreme Court stated that "[s]uch patent holders may be able to satisfy the traditional four-factor test" and should not be "categorically den[ied] . . . the opportunity to do so." *Id*. The Court noted that "some patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves." *Id.*

Chief Justice Roberts joined the majority but also penned a concurrence, writing that since "at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases." *Id*. at 395 (Roberts, C.J. concurring). This "long tradition of equity practice is not surprising given the difficulty of protecting the right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes"—a difficulty that suggests irreparable harm. *Id*. (quotation marks omitted). And the Chief Justice emphasized that this history is relevant to courts' assessment of injunctive relief today, as "[w]hen it comes to discerning and applying [the injunctive relief] standards, in

this area as others, a page of history is worth a volume of logic." *Id.* (internal quotation marks omitted).

Justice Kennedy also concurred, providing a different gloss. He wrote that he would limit the lesson of historical practice to cases that bear substantial parallels to the types of litigation then-prevalent, and that a patentee's use of its patents not for producing and selling goods—but instead for obtaining license fees—presented a consideration outside of historical practice. *Id.* at 395-96 (Kennedy, J. concurring).

After *eBay*, the Federal Circuit has recognized that "[w]hile a patentee is not entitled to an injunction in every case, it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude," citing Chief Justice Roberts's concurrence. *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1341 (Fed. Cir. 2017) (quoting *Presidio Components, Inc. v. Am. Tech. Ceramics Corp*., 702 F.3d 1351, 1362 (Fed. Cir. 2012)). "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017). Moreover, the "[d]ifficulty in estimating monetary damages is evidence" of irreparable harm, i.e., "that remedies at law are inadequate." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703-04 (Fed. Cir. 2008)). Irreparable harm is common in patent infringement cases because patents are hard to value and damages are difficult to calculate—as shown, for instance, by the frequent wide gap between a plaintiff's reasonable royalty calculation and a defendant's reasonable royalty calculation, even

when both parties' damages experts survive *Daubert* challenges. We discuss these concerns in Sections A and B, respectively.

### A. Like Other Types of Property, Patents Can Be Difficult to Value

A valid patent is inherently a unique asset—each patent claims a new, useful, and nonobvious invention. 35 U.S.C. §§ 101-103. And a valid patent has attributes both of personal property and of a public franchise, with the rights (like the right to an injunction) that the statute prescribes. *See* 35 U.S.C. § 261; *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 338 (2018). Precedent from property cases illustrate how irreparable harm in patent infringement cases can arise. *Cf. Robert Bosch*, 659 F.3d at 1149 (Courts should not "ignore the fundamental nature of patents as property rights granting the owner the right to exclude.").

Courts have found irreparable harm based on, *inter alia*, the loss of control over a unique product or business opportunity. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263-64 (10th Cir. 2004) (collecting cases). For example, in *Triple-A Baseball Club Associates v. Northeastern Baseball, Inc.*, 832 F.2d 214, 223-25 (1st Cir. 1987), the court found irreparable harm for failure to specifically perform a contract—sale of a sports franchise—because the franchise was a unique good whose market value could not be ascertained. *See also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (holding that the breach of an exclusivity provision was evidence of irreparable harm, including because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client"); *Core Progression Franchise LLC v. O'Hare*, No. 21-1151, 2022 WL 1741836, at *3 (10th Cir. May 31, 2022) (holding that the loss of control over a franchise business, and thus the loss of the opportunity to control the distribution of a unique product, supported the finding of irreparable harm).

The loss of control over a unique asset is relevant to the patent infringement context too, as infringement deprives the patent holder of the ability to control to whom it licenses its products and the terms of that licensing. For example, patent owners who rely on licensing as part of their commercialization strategy often desire to control the scope of a license. This includes licensing only for certain claims, competitors, markets, fields of use, geographies, or time frames. These elements of control are valuable because a license grant provides explicit authority from the patent owner to make, have made, use, sell, and/or offer for sale the invention. Without the license, any of these activities would infringe the patent(s). Patentees may also desire specific terms such as arbitration provisions for breaches of the license, auditing of a licensee's sales, or royalty payments in a running royalty, lump sum, or a combination. Even when the patentee desires to license its patent to the defendant, a court-imposed reasonable royalty lessens the patentee's ability to control the scope and terms of its license.

### B. The Difficulty of Calculating Damages from Patent Infringement Can Cause Irreparable Harm

In cases of unique assets, courts have commonly found irreparable harm when damages are difficult to calculate. *See, e.g.*, *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210-11 (10th Cir. 2009) (finding irreparable harm based on the unique nature of the property interest). Likewise, "courts have found that '[l]ost opportunity to create or gain control of a new market may result in unquantifiable losses for which there is no adequate remedy at law,'" supporting a finding of irreparable harm. *Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1023 (5th Cir. 2023) (quoting *Garth v. Staktek Corp.*, 876 S.W.2d 545, 549 (Tex. App. 1994)). Similar situations can arise in patent infringement cases because of the profound difficulties in calculating damages that adequately account for the patentee's loss of control over how to license their patent.

As courts have recognized, calculating patent damages can be very difficult and expensive. To determine a fair and reasonable royalty in the absence of an established royalty, courts consider what would be the result of a hypothetical negotiation between a theoretically "willing" licensor and a theoretically "willing" licensee in the past, before the infringement. *See Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988). Employing this methodology has been described as "a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge," or, more succinctly, as a "fantasy." *Id.* at 1574-75. And additional steps become necessary when the damages must be apportioned—for example, where a patent covers a component of a larger device or is part of an industry standard (i.e., a standard essential patent (SEP)). *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1232-33 (Fed. Cir. 2014) (describing the steps for SEPs).[3]

The large number of reversals based on flawed damages models confirms the difficulty of calculating damages. *See, e.g.*, *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1337-38 (Fed. Cir. 2025) (en banc) (reversing the denial of a new trial after a $20 million damages award based on unreliable expert testimony); *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 974 (Fed. Cir. 2022) (vacating a verdict of $85 million based on faulty expert testimony and remanding for a new damages trial); *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022) (vacating a verdict of $1.1 billion and remanding for a new damages trial); *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361 (Fed. Cir. 2021) (ordering new damages trial for insufficient evidence of a $5 per unit royalty).

[3] Indeed, for SEPs, "the jury must be told to differentiate the added benefit [of the patented invention] from any value the innovation gains because it has become standard essential," which is "difficult to do with precision." *Ericsson*, 773 F.3d at 1232-33 & n.9.

Post *eBay*, the Federal Circuit has recognized that the difficulty in calculating monetary damages for ongoing patent infringement is evidence of irreparable harm, i.e., that legal remedies are inadequate. *i4i*, 598 F.3d at 862 (Fed. Cir. 2010).[4] The Federal Circuit has likewise identified many situations where the loss of the right to exclude in a competitive market can lead to irreparable harm due to the difficulty in calculating monetary damages. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 644-45 (Fed. Cir. 2015) (finding an inadequate remedy at law when the loss of even single sale was difficult to calculate given downstream and network effects); *Metalcraft of Mayville*, 848 F.3d at 1368 (finding a likelihood of irreparable harm due to the loss of a life-long customer, which may have far-reaching, long-term impact on future revenue, and sales losses were difficult to quantify due to ecosystem effects); *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 792 (Fed. Cir. 2019) (finding the inherent difficulty in quantifying loss of market share and estimating monetary damages indicated that remedies at law are inadequate). And damages calculations for an ongoing royalty may be especially difficult for particular forms of royalties—e.g., royalties from an exclusive license, from licensing only to certain firms in a competitive market, or from structuring a license in a unique fashion. Absent established terms and royalty rates for a patent license, there is no straightforward way to calculate the royalty a patentee would accept for a license that is not artificially suppressed and otherwise negatively impacted by the infringement.

---

[4] The Federal Circuit also noted that it is difficult to calculate monetary damages for "loss of market share, brand recognition, and customer goodwill." *i4i*, 598 F.3d at 862; *see also TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920, F.3d 777, 792 (Fed. Cir. 2019) (affirming the district court's finding of irreparable harm because "TEK's lack of [product] diversification exposes it to a particular risk of lowered market share, and money damages cannot adequately compensate for the related injury to its reputation.").

The Federal Circuit has also held that "[e]ven without practicing the claimed invention, the patentee can suffer irreparable injury." *Presidio*, 702 F.3d at 1363. In *Broadcom*, 543 F.3d at 703, for example, the Federal Circuit held that the plaintiff "provided evidence of irreparable harm, despite the fact that it does not currently practice the claimed inventions" and had licensed the patents to another entity, and the court found irreparable injury and lack of an adequate legal remedy based on the difficulty of calculating monetary damages in a competitive "design-win" market. *Id.* The Federal Circuit acknowledged that the right of a patent holder to exclude likely would be diminished if payment were the preferred remedy because "a calculating infringer may [] decide to risk a delayed payment to obtain use of valuable property without prior negotiation or the owner's permission." *Presidio*, 702 F.3d at 1362-63.

Despite its recognition of irreparable harm from the difficulty of calculating damages, the Federal Circuit has yet to find harm for patentees who rely solely on licensing, at times citing Justice Kennedy's concurrence in *eBay* to support a view that for such patentees, damages are relatively straightforward to calculate. *See Apple*, 809 F.3d at 650-51 (Reyna, J. concurring) (quoting Justice Kennedy's concurrence and finding irreparable harm based on plaintiff having business objectives beyond obtaining licensing fees); *cf. Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 809 Fed. App'x 965, 976 (Fed. Cir. 2020) (explaining that the court has "held a lack of direct competition is a substantial basis for finding no irreparable harm," with royalties an adequate remedy for ongoing infringement); *Bianco v. Globus Med., Inc.*, 2014 WL 1049067, at *5 (E.D. Tex. Mar. 17, 2014) (Bryson, J.) ("Since the decision in *eBay*, numerous courts . . . have held that the plaintiff's status as a competitor or noncompetitor of the defendant weighs heavily in the court's determination whether to grant injunctive relief."). Accordingly, litigants may

hesitate to present arguments on the difficulty of calculating an ongoing royalty, perhaps viewing them as in tension with their claims for past damages.

Yet, the Federal Circuit has not held that an ongoing royalty can never be difficult to calculate or that it meant there could be no irreparable harm. Quite the opposite. The Federal Circuit has held that licensing is not fatal to finding irreparable injury, explaining that although a patent holder's choice to license its patents rather than competing directly with the infringer can contribute to a finding of no irreparable harm in particular cases where the monetary harm from infringement is "readily quantifiable," this does not "suggest[] that . . . there can be no irreparable harm absent direct competition." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1338 (Fed. Cir. 2012). Indeed, to adopt a broader rule—that licensing is effectively dispositive of the right to exclude infringers—would contradict *eBay*, 547 U.S. at 393-94. And it would risk creating a compulsory licensing scheme of the sort rejected by Congress. *See Dawson Chem. Co. v. Rohm & Haas Co*., 448 U.S. 176, 215 & n.21 (1980) (rejecting argument that would effectively create compulsory licensing scheme).

Adopting a broader rule that suggests irreparable harm is an insurmountable burden for a patentee that relies solely on licensing would affect the patentee's ability to seek not only preliminary but also permanent injunctive relief.[5] When damages are costly and fraught with significant uncertainty, an injunction can shift the burden of determining costs from the court to the parties. *See Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 275-77 (7th Cir. 1992) (Posner, J.) (granting a permanent injunction for breach of an exclusivity provision). In short, the prospect of an injunction can facilitate negotiation among the parties. *Cf. In re Mahurkar Double*

[5] The ability to show irreparable harm is likely lower for a plaintiff seeking a preliminary injunction in a patent-infringement case, as compared to a permanent injunction, because with the former there has been no final determination that the patent has been infringed.

*Lumen Hemodialysis Catheter Pat. Litig.*, 831 F. Supp. 1354, 1397 (N.D. Ill. 1993) (Easterbrook, J., sitting by designation) ("The injunction creates a property right and leads to negotiations between the parties. A private outcome of these negotiations—whether they end in a license at a particular royalty or in the exclusion of an infringer from the market—is much preferable to a judicial guesstimate about what a royalty should be."). By contrast, without an injunction, a patentee would lose control of their unique asset—their patent—including whether or how its patented invention is distributed in the marketplace. *See* Adam Mossoff, *The Injunction Function: How and Why Courts Secure Property Rights in Patents*, 96 NOTRE DAME L. REV. 1581, 1594–95 (2021) (describing how in the absence of an injunction "property owners can no longer determine how best to use their property in the marketplace"). The prospect of an injunction thus provides patentees with important protections to control how or to whom to license its patented technology, as well as the terms of its licenses.

The possibility of an injunction also helps prevent potential licensees from viewing infringement as economically efficient, which would further erode the patent's value and the patentee's control over it. *See* Kristen Jakobsen Osenga, *"Efficient" Infringement and Other Lies*, 52 SETON HALL L. REV. 1085, 1086-87 (2022); *see also* Mossoff *supra* at 1594-95 ("Contracts are replaced by 'efficient infringement' in which putative licensees can exploit costly judicial or regulatory processes to depress licensing rates, which reduces the willingness of innovators to create new inventions and invest in new commercial mechanisms for deploying these inventions in the marketplace."); *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988) ("[I]n the absence of the injunction, other potential infringers will be encouraged to infringe."). A first and a second licensee may accept a license at a negotiated rate, but the next potential licensee may demand a lower price—not because it values the technology less, but

because the willingness to license further weakens the likelihood of an injunction. This could incentivize parties not to pay now when the worst-case scenario (absent a finding of willful infringement) is having to pay later. *See* Osenga, *supra* at 1087, 1090-91. Then, once the litigation begins, the chances any company will take a license are significantly reduced until a court renders a final verdict, thereby reducing incentives to settle and increasing the number and durations of cases, while also inflicting additional cost on the patent owner simply to get to that result. *See id.* at 1103.

These principles are applicable to the instant case because Radian alleges that it faces losses that "cannot be quantified or reduced to calculable damages." Radian Mot. 17-19, 21; Jadon Decl. ¶53-54. And Samsung does not counter that there is an established license or royalty for Radian's patents that would make damages straightforward to calculate. *See* Samsung Opp. 9-14. While the United States does not take a position on whether Radian has established a likelihood of irreparable harm, the Court should examine the difficulty of calculating damages for ongoing patent infringement, including for the loss of control over the patent.[6]

## II. Recognizing a Likelihood of Irreparable Harm Would Not Resolve the Dispute

Even if a likelihood of irreparable harm exists, that does not by itself establish a right to a preliminary injunction. Irreparable harm is just one factor under the traditional four-factor test; a court must find the other factors satisfied before issuing an injunction. *eBay*, 547 U.S. at 391; *Winter*, 555 U.S. at 20. For instance, if a finding of infringement is unlikely, then an injunction

[6] The United States notes that sometimes the evidence will not support a finding of difficulties with calculating a royalty. For example, if the plaintiff is willing to license and if there is already a well-established royalty rate for all comers (which is not disputed by the accused infringer), an injunction likely will not be appropriate, because the plaintiff would get everything it asked for if it wins on validity and infringement.

should not issue regardless of whether irreparable harm would otherwise result. Likewise, there could be situations where the balance of harms weighs against an injunction.

Furthermore, traditional equitable practice and *eBay* require courts to tailor injunctive relief to the equities of the case, including the scope and timing of the injunction. For example, if a defendant is not a willful infringer, and has substantial investment in a product line, it may be inequitable to enjoin the sales of existing inventory. Equity might also require delaying the effective date of an injunction to allow the defendant the opportunity to negotiate a license or remove infringing components or features from future products. *See Broadcom*, 543 F.3d at 704-05 (upholding a sunset provision in an injunction to allow for the development of non-infringing substitutes).

An injunction should not be punitive and is not designed to give a patent owner undue leverage. Rather, an injunction serves "to prevent the violation of any right secured by a patent." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed. Cir. 1993) (quoting 35 U.S.C. § 283). The leverage that it provides depends on the value of the patent: If there are equally good non-infringing alternatives to the patented technology, then an appropriately scoped injunction will provide very little leverage. But if the invention is essential to the value of the product, the injunction will provide greater leverage in license negotiations. An appropriately scoped injunction leaves it to the parties, rather than courts, to determine the value of the technology.

## CONCLUSION

This Court should consider Radian's evidence of a likelihood of irreparable harm, including any evidence that monetary damages are difficult to calculate.

Dated: June 24, 2025

Respectfully submitted,

/s/ *Andrew N. DeLaney*

NICHOLAS T. MATICH
*Acting General Counsel*

AMY J. NELSON
*Acting Solicitor*

ROBERT J. MCMANUS
*Acting Deputy Solicitor*

SARAH E. CRAVEN
MICHAEL TYLER
*Associate Solicitors*

Office of the Solicitor
U.S. Patent & Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, VA 22313
Telephone: 571-272-9035
*Attorneys for the Acting Director of the U.S. Patent & Trademark Office*

ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

MARK H. HAMER
DINA KALLAY
WILLIAM RINNER
*Deputy Assistant Attorneys General*

DAVID B. LAWRENCE
*Policy Director*

YIXI (CECILIA) CHENG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
ANDREW N. DELANEY
*Attorneys*

U.S. Department of Justice,
Antitrust Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 914-256-0514
E-mail: andrew.delaney@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, I caused the foregoing to be filed through this Court's CM/ECF filer system, which will serve a notice of electronic filing on all registered users, including counsel for all parties.

/s/ *Andrew N. DeLaney*